## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. _____

**UNITED STATES OF AMERICA**
**ex rel., Julie Reed,**

      **Plaintiff,**

**v.**

**KEYPOINT GOVERNMENT SOLUTIONS,**

      **Defendant.**

---

## COMPLAINT

---

## INTRODUCTION

1.     Relator Julie Reed, by and through counsel, on behalf of herself and the United States of America, brings this action against Defendant KeyPoint Government Solutions for money damages and civil penalties arising out of KeyPoint's violations of the False Claims Act, 31 U.S.C. § 3729.

2.     KeyPoint Government Solutions is the second leading contractor with the United States Office of Personnel Management (OPM) for background investigative services used by numerous government agencies to determine individuals' suitability for employment and security clearances.

3.     Relator Julie Reed, in her former capacity as Senior Quality Control Analyst with KeyPoint, has first-hand knowledge that KeyPoint knowingly made fraudulent claims to OPM

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

which allowed KeyPoint to bill OPM for work that was not completed or was inadequately or improperly completed.

4.      KeyPoint falsely stated to OPM that KeyPoint had conducted full, thorough, and accurate investigations that met contractual requirements when, in fact, the investigations were incomplete, improper, and defective.

5.      KeyPoint falsely stated to OPM that KeyPoint had conducted complete case reviews and quality control checks of each investigation in compliance with contractual requirements when KeyPoint did not conduct the required full case reviews or the required quality control checks.

6.      KeyPoint falsely stated to OPM that KeyPoint had implemented contractually required Corrective Action plans when KeyPoint had not implemented Corrective Action plans.

7.      KeyPoint fraudulently billed OPM for complete investigations when KeyPoint did not conduct complete investigations; and KeyPoint did so by knowingly submitting false and incomplete information to OPM.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this complaint pursuant to 31 U.S.C. § 3729, as it asserts a claim that arises under the Constitution, laws, or treaties of the United States.

9.      This Court has personal jurisdiction over KeyPoint pursuant to 28 U.S.C. §§ 1391(b) and 1391(c), because KeyPoint transacts business and possesses real property in this judicial district.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 2 -

10.     Venue is appropriate pursuant to 31 U.S.C. § 3732(a) because KeyPoint can be found in and transacts business in this judicial district.

**PARTIES**

11.     Relator Reed is a former employee of KeyPoint and was a resident of the State of Colorado when KeyPoint employed her.

12.     Defendant KeyPoint conducts business at its headquarters at 1750 Foxtrail Drive in Loveland, Colorado.  KeyPoint is a leading provider of investigative and risk mitigation services to government organizations, including OPM, Customs and Border Protection, and the Department of Homeland Security.

**FACTUAL ALLEGATIONS**

**A.      Reed discovered and disclosed that KeyPoint investigators submitted incomplete and inadequate investigations in violation of the OPM contract.**

13.     KeyPoint is a major government contractor that specializes in providing background investigation services to the United States government.

14.     In 2011, KeyPoint was awarded a $70 million contract with the Office of Personnel Management to conduct background investigations, which OPM contracted on behalf of various government agencies.

15.     The contract amount more than doubled to $149.5 million in 2012.

16.     While Reed does not have a copy of the contract, she knows that the contract totaled $219.5 million over the past two years.

17.     USASpending.gov indicates that KeyPoint was paid $140 million in 2012 and $343.1 million in 2013 by OPM.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 3 -

18.     Reed has a document that references OPM Contract OPM15-11-C-0016.

19.     Under the contract, KeyPoint performed thousands of background investigations for OPM.

20.     The required depth and thoroughness of an investigation varies depending upon the type of clearance being sought for the subject of the investigation.

21.     OPM pays KeyPoint a set amount if KeyPoint completes an investigation by a deadline stipulated by the contract.

22.     If KeyPoint does not meet the contractual deadline, OPM pays KeyPoint lower amounts for each day the deadline is exceeded.

23.     Depending on the type of investigation, the payments from OPM to KeyPoint decrease, due to the missed deadlines, by amounts ranging from several hundred to over a thousand dollars.

24.     One of the most common types of investigations assigned to KeyPoint involves a Top Secret (TS) clearance.

25.     To conduct a proper investigation for a TS clearance under the contract, OPM requires KeyPoint to (1) conduct an in-person interview of the subject; (2) review the subject's work, education, and residence history for the past ten years and conduct in-person interviews with at least one additional source for each 12-month period in the prior ten-year time frame; (3) conduct re-interviews of at least 30% of all sources; (4) conduct a thorough case review of each case, which consists of (a) ensuring that all relevant twelve-month periods for the prior ten years are accounted for with respect to employment, education and residence, as well as (b) reviewing the accuracy of all interviews for any derogatory information before releasing the case to OPM;

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 4 -

and (5) re-open any cases that do not meet the full coverage timeframe or that include derogatory information.

26.     OPM relies on the investigation information provided by KeyPoint and passes it on to other government agencies that, in turn, rely on the information to make hiring decisions and grant security clearances.

27.     As a Senior Quality Control Analyst at KeyPoint, Reed directly observed a number of violations of the contract of which KeyPoint was aware but did nothing to correct, and hid from OPM by false statements.

28.     Some of the most common violations from investigators included:

a.  Cases that should have been flagged by KeyPoint as "issue cases," but were instead certified to OPM by KeyPoint as "complete without issue;"

b.  Cases sent to OPM without the full source coverage for the relevant timeframe;

c.  Investigators certifying they had conducted a full interview when they had not;

d.  Interviews routinely conducted by telephone (an interview method that was only permitted in extreme situations); and

e.  Investigators failing to submit case notes to verify the validity of their interviews.

**B.      KeyPoint hid improper investigations from OPM and knowingly billed OPM as though the investigations had been properly conducted.**

29.     Reed has personal knowledge of numerous investigators who consistently submitted inadequate investigations.

30.     KeyPoint management imposed heavy workloads and unrealistic deadlines on KeyPoint investigators.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 5 -

31.     The KeyPoint workload and deadlines put investigators in a difficult position; investigators knew that conducting a full and proper investigation often meant a case could not be completed by its deadline and workloads could not be managed.

32.     KeyPoint knowingly gave its reviewers the choice of (1) meeting deadlines by conducting improper investigations; or (2) maintaining the required quality of investigations and missing deadlines – and thus risking their jobs.

33.     KeyPoint investigators thus frequently "cut corners" – by conducting improper investigations.

34.     One way investigators cut corners was to conduct interviews by telephone instead of in person.

35.     In her most recent position at KeyPoint, Reed was responsible for quality control of KeyPoint investigators who submitted telephone testimonies.

36.     One such investigator was Peter Hanson, a contract investigator in Colorado.

37.     Reed became aware of Hanson's improper investigative methods when he submitted documents showing that he had conducted at least 50% of his interviews via telephone for seven out of twelve months from late 2012 to the fall of 2013.

38.     Hanson's excessive use of telephone interviews was "flagged" by OPM prior to April 2013.

39.     Investigators are not routinely permitted to conduct more than 10% of their interviews by phone, and may only do so under certain limited circumstances.

40.     Reed went to Hanson's KeyPoint Field Manager, Natalie Peterson, to determine why Peterson had allowed Hanson to conduct such a large percentage of interviews by phone.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 6 -

41.     Peterson told Reed that Hanson had a remote area of Wyoming to cover, which qualified as a permissible "geographic extenuating circumstance."

42.     Reed then scrutinized Hanson's records and found that he conducted telephone interviews of sources within a ten mile radius of his home in Colorado, not in remote locations in Wyoming.

43.     Reed also determined that Hanson did not even attempt to set up in-person interviews with many of his sources.

44.     Additionally, Reed discovered that Hanson had logged phone interviews that often lasted less than five minutes.

45.     An investigator cannot ask all the questions required for a full interview in less than twenty minutes, let alone get complete answers to those questions from a properly questioned source.

46.     Reed reported Hanson for disciplinary action by KeyPoint.

47.     KeyPoint Regional Manager Greg Banton learned of Reed's "write-up" of Hanson.

48.     Banton, like Peterson, initially tried to persuade Reed that Hanson was covering remote territory.

49.     Reed showed Banton the evidence to the contrary, and Banton eventually agreed to allow Reed to talk to Hanson rather than officially reprimand him.

50.     In June 2013, Reed asked Hanson why he conducted interviews via telephone of sources close to his home.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 7 -

51.     Hanson told Reed that he had been instructed by his manager, Peterson, to close out interviews quickly by telephone.

52.     KeyPoint's instruction to Hanson, through Reed, violated KeyPoint's requirements under its contract with OPM.

53.     In April 2013, OPM again flagged Hanson for conducting too many investigations by telephone.

54.     Reed determined that Peterson had submitted a Corrective Action response to OPM that falsely stated Hanson was covering remote territory, even though Peterson knew that was not true.

55.     Reed discovered similar violations involving other KeyPoint investigators, including Brooke Connor and Aerin Alexander.

56.     Conner similarly violated the telephone interview threshold on seven of twelve months, sometimes conducting up to 70% of her interviews by phone.

57.     Reed approached Connor's KeyPoint Field Manager, Shannon Ireland, about Connor's violations.

58.     Ireland has no investigative experience or training and lacked the basic understanding necessary to evaluate the performance of her investigators.

59.     In working with Alexander's KeyPoint Field Manager, Jackie Schwartz, Reed determined that Schwartz also lacked the skills necessary to evaluate the investigators she was supposed to manage.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 8 -

60.     Reed attempted to provide Ireland and Schwartz with some training on KeyPoint's internal Portal software (formerly Phoenix software), used to track case work, so the KeyPoint Field Managers could better evaluate and manage their investigators.

61.     But KeyPoint management told Reed not to "interfere" any further regarding Ireland and Schwartz.

62.     Reed learned of several instances in which KeyPoint management, including Regional Managers Greg Banton and Bill Narowdawg, hid investigative violations from OPM, and did so because KeyPoint knew its investigators were overloaded with cases, and KeyPoint needed every investigator to continue working cases regardless of violations.

63.     But KeyPoint management could not protect every investigator from the consequences of Reed's scrutiny.

64.     In early 2013, Reed discovered that Wayne "Bill" Matthews had conducted very brief telephone interviews and submitted incomplete reports of investigation.

65.     Matthews also failed to provide investigators notes to justify his telephonic interviews.

66.     Reed alerted her KeyPoint supervisor, Lori Matson, but months went by and KeyPoint took no action to correct Matthews.

67.     Reed eventually pressed Matson to explain how KeyPoint could allow Matthews to continue conducting investigations.

68.     Eventually, KeyPoint fired Matthews.

69.     But KeyPoint never alerted OPM of Matthews' fraud and never alerted OPM to re-open any of his fraudulent investigations.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

70.     Instead, KeyPoint billed OPM for all of Matthews' work as though he had properly performed the work.

71.     Reed discovered similar fraud by KeyPoint investigator Terrance Keehan.

72.     Reed determined that Keehan violated phone protocols and submitted inadequate testimonies.

73.     On Case #1320128972, for example, Keehan conducted 14 of the 15 source interviews by phone, grossly exceeding the 10% best practice threshold established by training protocols, and grossly exceeding the 30% threshold OPM set as the limit before corrective action is required.

74.     Keehan also conducted interviews in less than five minutes, far too short to complete a thorough investigation.

75.     KeyPoint eventually fired Keehan, on or around July 2013.

76.     But, as with Matthews, KeyPoint never alerted OPM of Keehan's fraud and never alerted OPM to re-open any of his fraudulent investigations.

77.     Instead, KeyPoint billed OPM for all of Keehan's work as though he had properly performed the work.

78.     A third KeyPoint investigator, in Connecticut, told Reed that he could not submit his case notes to Reed because he had burned them all in a trash bin in his backyard.

79.     KeyPoint fired this third investigator.

80.     But, as with Matthews and Keehan, KeyPoint never alerted OPM of the improper investigative methods and never alerted OPM to re-open any of the investigations.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 10 -

81.     Instead, KeyPoint billed OPM for all of the third investigator's work as though he had properly performed the work.

**C.     OPM required KeyPoint to review each investigation to ensure proper investigative methods, but KeyPoint knowingly encouraged improper reviews, and hid those improper reviews from OPM, while billing as if the reviews had been performed as required.**

82.     After KeyPoint investigators complete their source interviews for the required periods of coverage, OPM requires that a KeyPoint case reviewer then review each case.

83.     Case reviewers should ensure that KeyPoint investigators have covered all the proper time frames by conducting the appropriate number of source interviews; and should ensure that all testimony is properly flagged either as "clean" or as containing "derogatory" information.

84.     Reed, in her quality control capacity, determined whether KeyPoint's investigations had been properly conducted.

85.     This often caused Reed to examine the KeyPoint review process to determine how KeyPoint had released a case to OPM when the investigator's work was incomplete, inaccurate, or otherwise improper.

86.     Reed learned that KeyPoint reviewers often released cases to OPM even though the cases did not meet source coverage requirements.

87.     Reed learned that KeyPoint reviewers often released cases to OPM that contained derogatory information but were falsely marked "clean" to indicate that they contained no derogatory information.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 11 -

88.     Reed learned that KeyPoint reviewers often released cases to OPM that contained conflicting source information and, because of the conflicting source information, should have been re-opened instead of released.

89.     KeyPoint management imposed internal performance quotas on KeyPoint case reviewers; the KeyPoint quotas put reviewers in a difficult position.

90.     When a reviewer identified a case that needed more work done in order to meet the investigative requirements, "re-opening the case" to the investigator often meant that the case could not be completed by its deadline.

91.     When a reviewer's case did not meet deadlines, KeyPoint management reprimanded and threatened to terminate the reviewer.

92.     KeyPoint knowingly, gave its reviewers the choice of (1) meeting deadlines by overlooking improper investigations; or (2) maintaining the required quality of investigations and risk losing their jobs.

93.     Reed repeatedly reported improper reviews to her supervisor, Matson; to the Director of the OPM contract, Scott Kobasick; and to Regional Managers Banton and Narowdawg.

94.     Kobasick and Matson acknowledged the improper reviews but took no action to solve the problems or to alert OPM.

95.     KeyPoint routinely billed OPM for investigations that were not properly reviewed.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 12 -

**D.    KeyPoint quality control staff failed to perform their duties, but passed off their work as properly performed.**

96.    Reed, in her quality control capacity, was required to review investigations as well as the subsequent case reviews; and failures at these levels of the process often required Reed also to check the subsequent quality control process.

97.    Reed found numerous instances in which KeyPoint quality control staff failed to perform their contractual duties, but passed off their work as properly performed.

98.    Reed determined that KeyPoint quality control staff frequently failed to conduct the proper number of re-interviews and falsely claimed that they had; and frequently conducted inadequate re-interviews and falsely claimed the re-interviews were complete.

99.    OPM requires that KeyPoint, or any investigative services provider, conduct re-interviews on at least 30% of sources to ensure proper interviews and reviews.

100.    Reed, after discovering the falsifications of KeyPoint quality control staff, reported the violations to her supervisor, Matson.

101.    Reed also reported the quality control failures, in 2012 and in 2013, to KeyPoint's Quality Control Directors.

102.    In 2012, Donna Bruder was the Quality Control Director.

103.    In 2013, Jennifer Weigand was the Quality Control Director.

104.    Weigand, along with Regional Managers Narowdawg, Banton, and Brooks, was required to ensure the delivery of proper levels of quality control.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 13 -

105.     Like KeyPoint's investigators and case reviewers, the KeyPoint quality control staff faced unrealistic quotas and a workload that encouraged "cutting corners" – tolerating and hiding improper investigative methods – to meet deadlines.

106.     Clarice Bruce, a veteran member of the quality control staff, told Reed that the less experienced quality control staff tasked was overwhelmed by the caseload and unable to perform the required re-interviews.

107.     As described above, KeyPoint investigators routinely failed to conduct proper investigations; and KeyPoint case reviewers routinely ignored, or failed to identify, the improper investigative methods.

108.     For example, the case reviewers and field managers assigned to the investigations performed by investigators Keehan, Matthews, Alexander, Conner, and Hanson all ignored, or failed to identify, significant lapses in protocol, and all of these case reviewers falsely certified that their reviews were thorough and complete.

109.     Reed has specific knowledge of several quality control staff who failed to perform their contractually required duties, as described above.

110.     For example, Heather Cochran was one member of the KeyPoint quality control staff who consistently failed to perform her duties, while certifying that she had ensured the proper levels of quality control.

111.     Reed reported the failures of Cochran and other quality control staff to the current Quality Control Director, Jennifer Weigand, and to Weigand's predecessor, Donna Bruder.

112.     Neither took any action to correct the violations, and KeyPoint never informed OPM of the improper quality control and never alerted OPM to re-open any of the investigations.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 14 -

113.    Instead, KeyPoint billed OPM for the investigations as though the quality control had been  properly performed.

**E.      KeyPoint falsified certified to OPM that it had taken corrective actions to address violations by investigators, and routinely failed even to notify investigators that they had been the subject of Corrective Action notices and reports.**

114.    OPM requires that KeyPoint monitor the performance of its investigators.

115.    If investigators fail to perform their duties properly, OPM requires that KeyPoint issue Corrective Action plans to ensure the failures are corrected and do not continue.

116.    KeyPoint usually initiates the corrective process by "flagging" employees for corrective action, but OPM may also, and does, issue Corrective Action plans.

117.    Reed, in her quality control capacity, has direct knowledge that KeyPoint management routinely falsified Corrective Action plans and reports.

118.    In reviewing Corrective Action reports, Reed discovered that the comments in the manager and investigator sections of the reports were exactly the same, month after month, indicating that KeyPoint management routinely copied and pasted the previous month's comments into the reports rather than generate actual comments.

119.    Reed discovered that KeyPoint failed to tell its investigators that they had been issued Corrective Action reports.

120.    When Reed contacted certain KeyPoint investigators regarding their Corrective Action reports, many did not know that they had been issued a report.

121.    KeyPoint management thus falsely, and routinely, certified to OPM that issues requiring corrective action had been addressed, when in fact KeyPoint managers had not even discussed the problems with the investigators.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 15 -

122.   Reed also discovered that KeyPoint managers fabricated extenuating circumstances in some cases to justify an investigator's violations.

123.   As described above, investigator Hanson grossly violated the telephone testimony threshold.

124.   Hanson's violations required that he be issued a Corrective Action report.

125.   In May 2013, OPM sent a letter to KeyPoint that requested the corrective action status for twelve KeyPoint investigators, including Hanson.

126.   After Reed had investigated Hanson and determined that Hanson had violated the telephone testimony requirements, and had also determined that the offered justification for the violations – that Hanson was covering remote territory in Wyoming – was false, KeyPoint management still proffered the false excuse in KeyPoint's Corrective Action response to OPM.

127.   In addition, the Corrective Action report also falsely stated to OPM that Hanson's Field Manager, Peterson, counseled him during each of the months in which Hanson exceeded the telephone interview threshold.

128.   Hanson told Reed the exact opposite: he conducted the phone interviews at the instruction of Peterson, in order to complete more cases by their deadlines.

129.   KeyPoint investigator Jodi Malloy was also flagged for corrective action after repeated violation of the telephone testimony program.

130.   At the time, her Field Manager was Bill Narowdawg.

131.   Malloy moved from Reno, Nevada to Las Vegas, Nevada.

132.   Initially, her excessive use of telephone interviews was permitted because she continued to be assigned cases in the Reno area.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 16 -

133.    Several months after Malloy relocated, Narowdawg continued to certify to OPM via Corrective Action reports that Malloy was still covering cases in Reno because KeyPoint had not yet found a replacement for her in that area.

134.    When Reed looked into Malloy's case work, Reed discovered Narowdawg's certifications to OPM were false.

135.    Reed discovered that KeyPoint had assigned Malloy to case work primarily in the Las Vegas area, near Malloy's home, and that Malloy was conducting telephone interviews near her home in Las Vegas.

136.    Reed took this evidence to her supervisor, Matson.

137.    When Reed spoke to Malloy about her excessive number of telephone interviews, Reed learned that KeyPoint had failed to tell Malloy that she had ever been issued a Corrective Action notice regarding the issue.

138.    After Reed's discovery and disclosure, KeyPoint, through Narowdawg, continued falsely to certify to OPM that Malloy was conducting telephone interviews with subjects in the Reno area.

139.    KeyPoint management falsely, and routinely, certified to OPM that required Corrective Actions had been taken when, in fact, KeyPoint did nothing.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 17 -

## COUNT I
### Falsely Certifying the Proper Performance of Security Investigations
### Violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)

140.    Reed incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

141.    KeyPoint knowingly presented or caused to be presented to the United States false or fraudulent claims, by  falsely certifying that KeyPoint investigators conducted complete, accurate, and proper investigations, in order to obtain payment under a U.S. Office of Personnel Management contract in violation of 31 U.S.C. § 3729 (a)(1)(A).

142.    The United States, unaware of the falsity of the claims and/or statements made by KeyPoint and in reliance on the accuracy thereof, paid KeyPoint for such false or fraudulent claims.

143.    By reasons of the fraudulent acts of KeyPoint in violation of 31 U.S.C. § 3729 (a)(1), the United States has suffered substantial actual damages, including the amounts paid in response to all such fraudulent claims for payment, and the United States continues to be damaged.

144.    The United States has also suffered and continues to suffer undefined damages that are a direct result of KeyPoint jeopardizing national security by certifying false information used to determine the suitability of security clearances.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

- 18 -

## COUNT II
**Falsely Certifying the Proper Performance of Case Reviews and Quality Control Checks
Violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)**

145.     Reed incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

146.     KeyPoint knowingly presented or caused to be presented to the United States false or fraudulent claims, by falsely certifying that KeyPoint case reviewers and quality control staff conducted complete and accurate case reviews and quality control checks, in order to obtain payment under a U.S. Office of Personnel Management contract in violation of 31 U.S.C. § 3729 (a)(1)(A).

147.     By reasons of the fraudulent acts of KeyPoint in violation of 31 U.S.C. § 3729 (a)(1), the United States has suffered substantial actual damages, including the amounts paid in response to all such fraudulent claims for payment, and the United States continues to be damaged.

148.     The United States has also suffered and continues to suffer undefined damages that are a direct result of KeyPoint jeopardizing national security by certifying false information used to determine the suitability of security clearances.

## COUNT III
**Falsification of Corrective Action Reports
Violation of the False Claims Act, 31 U.S.C. § 3729 (a)(1)(A)**

149.     Reed incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

150.     KeyPoint knowingly presented or caused to be presented to the United States false or fraudulent claims, by falsely certifying that KeyPoint took appropriate corrective actions to

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

address the use of improper investigative methods, in order to obtain payment under a U.S.

Office of Personnel Management contract in violation of 31 U.S.C. § 3729 (a)(1)(A).

151.    By reasons of the fraudulent acts of KeyPoint in violation of 31 U.S.C. § 3729

(a)(1), the United States has suffered substantial actual damages, including the amounts paid in

response to all such fraudulent claims for payment, and the United States continues to be

damaged.

## PRAYER FOR RELIEF

WHEREFORE, Relator Julie Reed, acting on behalf of and in the name of the United

States of America and on her own behalf, demands and prays that judgment be entered against

the Defendant KeyPoint for violations of the federal False Claims Act:

(a)    In favor of the United States against KeyPoint for treble damages to OPM from
        the submission of false claims and concealment of fraudulent investigative
        practices in violation of the contract at issue plus maximum civil penalties for
        each violation of the False Claims Act;

(b)    In favor of Reed for the maximum damages allowed pursuant to 31 U.S.C. §
        3730(d) to include reasonable expenses, attorneys' fees, and costs incurred by
        Relator;

(c)    For all costs of the FCA civil action;

(d)    In favor of Relator Reed and the United States for further relief as this Court
        deems to be just and equitable; and

(e)    Such other relief as this Court deems just and appropriate.

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

Dated: January 2, 2014                          Respectfully Submitted,

                                                /s/ Jason M. Lynch
                                                Jason M. Lynch
                                                REILLY POZNER LLP
                                                1900 Sixteenth Street, Suite 1700
                                                Denver, Colorado 80202
                                                (303) 893-6100
                                                jlynch@rplaw.com

                                                *Counsel for Plaintiff Julie E. Reed*


                                                /s/ R. Scott Oswald
                                                R. Scott Oswald (*pending admission to
                                                the District of Colorado*)
                                                John T. Harrington (*pending admission to
                                                the District of Colorado*)
                                                The Employment Law Group, P.C.
                                                888 17th Street, N.W., Suite 900
                                                Washington, D.C. 20006
                                                (202) 261–2803
                                                (202) 261–2835 (facsimile)
                                                soswald@employmentlawgroup.com
                                                tharrington@employmentlawgroup.com

                                                *Counsel for Plaintiff Julie E. Reed*

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via UPS,

on this 2nd day of January, 2014, upon:

Eric Holder, Esq.
Attorney General of the United States
Office of the Attorney General, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Daniel Anderson
Deputy Director, Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Melissa Handrigan
Civil Division
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC  20530-0001

Chris Larson
Assistant United States Attorney
United States Attorney's Office
District of Colorado
1225 17th Street
Suite 700
Denver, CO 80202

*/s/ John T. Harrington* _____
John T. Harrington (*pending admission to the District of Colorado*)

*CONFIDENTIAL AND UNDER SEAL – QUI TAM COMPLAINT*
*United States ex rel. Reed v. KeyPoint Government Solutions*